37717. ATLANTIC COAST LINE RAILROAD COMPANY
*et al. v.* GRIMES.

DECIDED JULY 1, 1959.

*Douglas W. Matthews, R. A. Moore, Jay, Garden & Jay, Allan C. Garden,* for plaintiffs in error.

*Dewey Hayes, McDonald & McDonald, J. C. McDonald,* contra.

FELTON, Chief Judge. ■ J. Clark Grimes, husband of the plaintiff, was struck and killed on June 26, 1956, by a freight train of the defendant railroad operated by defendant Braswell while Grimes was attempting to cross the main-line track on a paved road in the city of Ambrose, Georgia. The evidence discloses that Grimes operated a grocery store to the northeast of the crossing; that in the late afternoon he had proceeded to the postoffice, which is located in a building to the southeast of the crossing; that the shortest and most convenient route from his store to the postoffice was by way of the paved state highway which crossed the railroad in the center of the village; that the crossing was equipped with flange boards which were approximately the same height as the rails and afforded relatively smooth passage across the tracks for both vehicles and pedestrians; that Grimes, as well as others, had habitually crossed the railroad at this point for some time; that on several occasions the railroad station agent had cautioned Grimes about crossing the railroad ahead of trains and told him to watch for the train. There were three tracks at the crossing point, a "house track" on the north, the main line in the center and a "pass track" on the south, the distance between the center of each side track and the center of the main line track being about 15 feet. The

evidence shows that shortly before 5 p.m., Grimes left the post-office and proceeded in a northerly direction along the paved road, apparently intending to return to his store across the tracks. At this time the freight train was approaching the crossing from the east, to the right of Grimes. The weather was clear and there was nothing at or near the crossing in this direction to obstruct the vision either of pedestrians or of the train crew. At a point on or just across the "pass track" south of the main line, Grimes looked in the direction of the train and proceeded onto the main line where he was struck by the right-hand side of the locomotive and instantly killed. Several witnesses for the defendants testified that as Grimes proceeded onto the track he quickened his pace, but Riley Carver, also a witness for the defendants, testified that "if he changed his pace I couldn't tell it." Grimes had suffered for some twenty years from a condition described by the witnesses as "palsy," which caused him to walk in a stooped condition and, according to witness Jowers, "he was very much arched . . . and when he looked he had to turn his whole head and he was so that he couldn't turn it very well . . . and he would walk in more or less surges." There is no evidence to indicate any substantial defect in Grimes' hearing or vision.

The defendant Braswell, engineer of the freight train, testified that as he approached Ambrose he had switched on the automatic bell ringer and had sounded regular crossing signals on the horn of the locomotive for two dirt road crossings some distance to the east of the paved crossing, the second of which is referred to as the "gin house crossing", being some 900 feet east of the paved crossing; that he first saw Grimes "about the time I come across that gin house crossing"; that Grimes was then "between 25 to 40 feet of the . . . main line track"; that he had started to blow the standard signal for the paved crossing when he saw Grimes coming and that he immediately changed to the emergency signal of short blasts on the horn; that when Grimes was 10 to 15 feet from the main line track "he turned his head . . . and looked right straight up at the engine", stopped momentarily and then started to go across the track, at which time the engineer applied the emergency brakes

to the entire train; that when he applied the brakes he was 250 to 300 feet east of the paved crossing and was traveling about 55 miles per hour; that no effort was made to stop or slow down the train until the application of the emergency brakes; that Grimes was struck by the right front portion of the locomotive; that he did not have any idea Grimes was going to walk out on the track and when he realized that Grimes would walk in front of the train he immediately applied the emergency brakes; that he knew Grimes personally, was aware of his physical condition, and recognized him as he approached the crossing.

Brakeman Silas McGowan was the only other member of the train crew in the cab of the locomotive as it approached Ambrose. He testified that the bell was tolling and that regular signals were sounded for the gin house crossing; that he first saw a man approaching the track along the paved road when the train was in the vicinity of the gin house crossing; that when the man kept on walking he told the engineer, "Look out, he don't see us," and that is when the engineer changed the whistle signals to emergency; that as the man was "about two steps from the crossing he looked and saw the train and apparently made up his mind to cross anyway"; that when the man started on across the track the engineer put on the emergency brakes which, as best he remembered, was between 200 and 300 feet from the crossing, and that the train was running about 50 miles per hour.

The defendants also introduced evidence tending to show that the bell and horn of the locomotive and the brakes of the entire train were in good working condition on this run.

A railroad company and its employees engaged in the operation of its trains must exercise ordinary care in so controlling the movements of such trains as to avoid doing injury to persons or property which may be on a crossing within the corporate limits of cities, towns or villages along its line. Code § 94-507; *Pollard* v. *Savage*, 55 *Ga. App.* 470 (190 S. E. 423), and cases cited. It is well settled that "what amounts to negligence, contributory or comparative negligence, proximate cause, etc., are ordinarily questions for the jury under appropriate instructions, and such questions will not be determined by the court

as a matter of law except in plain and undisputed cases." *Callaway* v. *Pickard*, 68 *Ga. App.* 637, 641 (23 S. E. 2d 564), and cases cited.

The testimony of the engineer and the brakeman as to the speed of the train while approaching the crossing is contradicted by that of Edward L. Frank and P. L. Jowers, Jr., witnesses for the plaintiff, who estimated the speed of the train at 60 to 70 miles per hour and by defendants' witness Riley Carver who estimated the speed at 55 to 60 miles per hour. In addition, M. L. Paulk, a witness for the defendants, testified that the train was 200 to 300 feet from the crossing when it gave the warning blasts. Under these circumstances, the evidence presents a question for the jury as to whether the defendants were negligent in approaching a crossing which was the main thoroughfare for vehicular and pedestrian traffic in a small community along its line at the rate of speed estimated by the witnesses and whether emergency signals were sounded at such distance from the crossing as to give timely and adequate warning of the train's approach. In *Chumley* v. *Louisville & Nashville R. Co.*, 45 *Ga. App.* 732 (165 S. E. 917), cited by the defendants, this court held that where a driver of an automobile, in response to the commands of a crossing watchman, turned his automobile around and away from the track and proceeded up a very steep driveway where his foot became hung in the reverse pedal of the automobile, causing it to run backwards down grade and into the engine as the train traversed the crossing, the excessive speed of the train and the failure to signal its approach was not the proximate cause of the driver's injury. In the instant case, however, the evidence creates an issue of fact for the jury as to the negligence of the defendants and whether this negligence was the proximate cause of the death of plaintiff's husband.

The defendants further contend that the negligence of Grimes was the sole direct and proximate cause of his injury and death, and that even if there was any negligence on the part of the railroad and its engineer, Grimes had a last clear chance to have avoided such negligence and thereby prevented his fatal injury, and his negligence bars a recovery. The arguments in support of these contentions are predicated on the assumption

that Grimes was aware of the approach of the train and consciously chose to test a known peril by crossing in front of it, whereas, in the exercise of ordinary care, he could have prevented his fatal injury. We cannot say, however, that the evidence demands a finding that Grimes was actually aware of the train's approach since it was a question for the jury whether, considering his crippled and deformed condition, he actually saw the train when he turned his head in its direction or whether he actually heard the signals which were sounded from the locomotive before he entered a position of peril on the tracks, especially in view of the conflict in the evidence as to where the signals were first sounded and as to whether Grimes increased his pace when walking onto the track. In this State, "it can not be said, as a matter of law, that the failure of a person, who is unaware of the approach of a train, to stop, look, or listen, renders such person guilty of a lack of ordinary care such as would prevent a recovery." *Porter* v. *Southern Ry. Co.*, 73 *Ga. App.* 718, 723 (37 S. E. 2d 831), and cases cited.

It is also contended by the defendants that "the facts in this case are clear and indisputable that Grimes' negligence was the proximate cause of his death." It is strongly urged that the use by Grimes of his senses of sight and hearing in an ordinarily diligent manner could have prevented the fatal injury from occurring. *Coleman* v. *Western & A. R.*, 48 *Ga. App.* 343 (5) (172 S. E. 577). While this may be true, there is also evidence indicating that as Grimes approached the main line track he was unaware of his peril and that his obliviousness was communicated to the engineer through the warning of the fireman, "Look out, he don't see us", at a considerable distance from the crossing. This being true, the evidence presents a question for the jury whether the engineer utilized with reasonable care and competence any ability which may then have existed upon his part to avoid harming the plaintiff, such as immediately applying the brakes when he first had reason to believe that Grimes was unaware of the train and inattentive to its approach. *Lovett* v. *Sandersville R. Co.*, 72 *Ga. App.* 692 (34 S. E. 2d 664). The jury could have found from the evidence that the deceased was unaware of the approach of the

train and was inattentive to his dangerous position and that when the emergency whistle was blown he had only a matter of seconds to come to his senses, realize and appreciate his danger and then to consciously and intelligently exercise sound judgment in making the choice that meant life or death. This court cannot say as a matter of law that under the facts which the jury was authorized to accept, the deceased was guilty of such negligence, after he became aware of his predicament, as bars a recovery. "In an action against a railroad company for injuries received by a person lawfully upon a railroad crossing, the question of what such person must or must not do in order to free himself of guilt of lack of ordinary care constituting the proximate cause of his injury is one for the jury." *Luke* v. *Powell*, 63 *Ga. App.* 795, 804 (12 S. E. 2d 196), and cases cited. The court did not err in overruling the defendants' motion for a judgment notwithstanding the verdict and the general grounds of the motion for a new trial.

■ Special ground 1 of the amended motion for a new trial assigns error on the admission of certain testimony by J. C. Grimes, Jr., that his father, the deceased, made between $2,000 and $2,500 a year in his grocery business prior to his death. It is contended that the business records would be the best evidence of the deceased's earnings. The witness testified that he and his father were partners in the business and: "I know what I made. I made the same thing he did exactly. I testified that he and I went 50-50. I made just as much as he did. That is what I made. I made between $2,000 and $2,500 a year and my father made the same thing I did." "As a general rule, the testimony of a person who has knowledge of the facts from which books of account are made up is as to those facts primary evidence, and is admissible, whether or not the books themselves are put in evidence." *Booth* v. *Schmoller & Mueller Piano Co.*, 32 *Ga. App.* 35 (3) (122 S. E. 636). "The court did not err in permitting witnesses to testify from their own personal knowledge as to the earnings of the plaintiff's husband, such testimony not being predicated on books of account of the husband which the defendant contended would be the best evidence." *Mayor &c. of Buford* v. *Medley*, 58 *Ga. App.* 48 (2) (197 S. E. 494). There is no merit in this ground.

■ Special ground 2 assigns error upon the following: "I charge you further that one who operates a locomotive engine, or drives a motor vehicle, at such speed that he can not bring the same to a stop within the distance dictated by the voice of ordinary care, does not have immediate or proper control of the conveyance, whatever be its nature." This charge is taken from *Ellis* v. *Southern Ry. Co.*, 96 *Ga. App.* 687 (101 S. E. 2d 230) and states the correct principle of law as to what is proper control. There is nothing in its content that would tend to impress the jury, that the ordinary care, the exercise of which would exonerate the defendants must be such care as would prevent the injury, as in *Louisville & Nashville R. Co.* v. *Rogers*, 136 *Ga.* 674 (2) (71 S. E. 1102), cited by defendants. This ground is therefore without merit.

■ Special ground 3 assigns error on the following charge of the court: "The engineer or person in charge of the locomotive, or locomotive engine, . . . shall observe any ordinance of such city, town, or village which may lawfully be passed regulating the speed at which railroad trains may run therein." It is contended that this charge tended to confuse and mislead the jury since there was no evidence that the City of Ambrose had adopted any ordinance regulating the speed at which railroad trains might be operated within its corporate limits. The instructions complained of are taken from the context of the court's charge, which quoted the entire contents of Code § 94-507 with reference to a railroad company's duties as to operation of its trains in incorporated municipalities. "Where the court gives in charge an entire Code section, a part of which is inapplicable to the issues, this is not ground for reversal unless it appears that the inapplicable portion was calculated to mislead or erroneously affect the jury in its rendition of the verdict." *Smith* v. *Payne*, 85 *Ga. App.* 693, 699 (70 S. E. 2d 163). No such adverse effect on the jury appears in this case and there is no merit in this ground. The court did not err in denying the amended motion for a new trial.

*Judgment affirmed. Quillian and Nichols, JJ., concur.*